**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
SIMPLY FIT OF NORTH AMERICA, INC. d/b/a
SIMPLY FIT OF THE NORTHEAST,

                      Plaintiff,

           -against-

CORT L. POYNER, ROBERT L. COX,
ISHMAEL GONZALEZ, DANIEL MINAHAN,
SIMPLY FIT HOLDINGS GROUP, INC., and
SIMPLY FIT HOLDINGS, L.L.C


                      Defendants.
-----------------------------------------------------------X

**MEMORANDUM OF**
**DECISION AND ORDER**
07CV5402 (ADS)(ARL)

**APPEARANCES:**

**ANTHONY M. VITTORIOSO, ESQ.**
Attorney for the Plaintiffs
7624 13th Avenue
Brooklyn, NY 11228

**ALTMAN & COMPANY P.C.**
Attorneys for the Defendants
Daniel Minahan and Cort L. Poyner
260 Madison Avenue, 22nd Floor
New York, NY 10016
        By:    Steven Altman, Esq.
                Eric Rosenberg, Esq., of counsel.

**EDWARD F. WESTFIELD, P.C.**
Attorneys for the Defendant Robert L. Cox
274 Madison Avenue
New York, NY 10016
        By:    Edward F. Westfield, Esq.

**NO APPEARANCE:**
Simply Fit Holdings, LLC.
Ishmael Gonzalez

Simply Fit Holdings Group, Inc.
*Formerly Represented by Altman & Company, P.C.,*
*Unrepresented at the Present Time*

**SPATT, District Judge:**

The plaintiff Simply Fit North America, Inc. d/b/a Simply Fit of the Northeast ("Northeast") commenced this action on December 28, 2007, alleging *inter alia* fraud and breach of contract against Cort L. Poyner, Robert L. Cox, Ishmael Gonzalez, Daniel Minahan, Simply Fit Holdings Group, Inc. ("Holdings"), and Simply Fit Holdings, L.L.C., (collectively, the "defendants"). The action arises from an exclusive distributorship agreement for the distribution of the defendants' wellness-drink product, "Simply-Fit." Presently before the Court is the defendants' motion to dismiss this action in favor of arbitration. The plaintiff, Northeast, is a New York corporation having its principal offices in Melville, New York 11747. The defendant, Holdings, is a Florida corporation having its principal offices in Lauderhill, Florida.

## I. BACKGROUND

### 1. Procedural History

On January 30, 2008, the defendants filed a motion to dismiss the action in favor of arbitration, and alternatively, for failure to state a claim directed to the plaintiff's RICO, breach of contract, and tortious interference with a contract claims.

On March 26, 2008, the plaintiff filed a first amended complaint. On April 18, 2008, the defendants filed a second motion to dismiss for failure to state a claim, once again

directed to the plaintiff's RICO, breach of contract, and tortious interference with a

contract claims, and additionally disputing the viability of the plaintiff's fraud claims.

The defendants recognized that the portion of their original motion seeking

dismissal for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) was rendered

moot by the first amended complaint and withdrew that portion of the motion. Upon

filing a motion to dismiss in response to the amended complaint, the defendants stated

that the part of their motion seeking dismissal in favor of arbitration remained pending

before the Court. On July 30, 2008, the plaintiff petitioned the Court for permission to

file supplemental briefing in opposition to the defendant's second motion to dismiss.

The Court granted that petition and authorized additional briefing and declarations by

each party. Accordingly, the present decision addresses only that portion of the

defendants' motion directed to the dismissal of the action in favor of arbitration.

**2.  The Present Motions**

The following facts are derived from the amended complaint and the parties'

submissions on the motion.

On or about July 13, 2007, Northeast and Holdings entered into a

distributorship agreement (the "Distribution Agreement") whereby Northeast was to

be the exclusive distributor of Holdings' product within a designated territory, defined

as the "Northeast United States."  Paragraph 11.8 of the Distribution Agreement is

entitled "Governing Law" and provides:

> This Agreement shall be governed by and construed in accordance with the laws of the State of Florida applicable to contracts executed and performed in such State, without giving effect to conflicts of laws principles.  All controversies, claims and matters of difference arising between the parties under this Agreement shall be submitted to binding arbitration in Palm Beach County, Florida under the Commercial Arbitration Rules of the American Arbitration Association ("the AAA") from time to time in force (to the extent not in conflict with the provisions set forth herein).  This agreement to arbitrate shall be specifically enforceable under applicable law in any court of competent jurisdiction.  Notice of the demand for arbitration shall be filed in writing with the other parties to this Agreement and with the AAA. Once the arbitral tribunal has been constituted in full, a hearing shall be held and an award rendered as soon as practicable.  The demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen, and the parties are not making progress toward a resolution.  In no event shall it be made after the date when institution of legal or equitable proceedings based on such claim, dispute or other matter would be barred by the applicable contractual or other statutes of limitations. The parties shall have reasonable discovery rights as determined by the arbitration.  The award rendered by the arbitrators shall be final and judgment may be entered in accordance with applicable law and in any court having jurisdiction thereof.  The decision of the arbitrators shall be rendered in writing and shall state the manner in which the fees and expenses of the arbitrators shall be borne.

Subsequently, in August 2007, Holdings and Northeast entered into an

"Extension Agreement" whereby Northeast obtained non-exclusive rights to distribute

Holdings' product in areas outside of the originally designated territory.  Paragraph 6

of the Extension Agreement provides that "[t]his Agreement supercedes all previous

agreements with respect to this subject matter and embodies the entire agreement

between the parties."  Paragraph 8 of the Extension Agreement sets for the Governing

Law/Forum Selection as follows:

> Any and all actions, claims or controversies of any kind arising out of this Agreement shall be governed by the laws of the State of Florida, without regard to any choice of law principles that may apply.  The parties agree to submit to jurisdiction of the Courts of the State of Florida or the federal district courts within the territorial boundaries of the State of Florida.

Further, on August 31, 2007, the parties exchanged an e-mail communication

memorializing a memorandum of understanding setting forth proposed changes to the

Distribution Agreement.

Thereafter, a dispute arose regarding the performance of the Distribution

Agreement.  Specifically, the complaint alleges that Holdings used the contract with

Northeast as leverage in its efforts to obtain financing from third parties and that such

funds were earmarked by Holdings to enrich its shareholders without ever having been

intended to meet the financial needs and commitments of Holdings.  (Compl. ¶ 4).  In

addition, the plaintiff alleges that after Northeast objected to Holdings' activities,

Holdings "sent an agent into Northeast's exclusive territory to surreptitiously

negotiate with distributors and retailers Northeast had been negotiating with or [was]

about to contract with."  (Compl. ¶ 6).  Finally, the plaintiff contends that Holdings,

through the individual defendants, made many false representations regarding its

intention to market and support, and even supply  its "Simply-Fit" product pursuant to

the Distribution Agreement. (Compl. ¶¶ 22–27).  The plaintiff contends that it was injured in reliance on the defendants' fraudulent misrepresentations.

The defendants contend that the broad arbitration provision of the Distribution Agreement requires the submission of any claims arising from or "touching on" the Agreement to the American Arbitration Association (the "AAA") in Florida.  Further, the defendants contend that the incorporation of the Commercial Arbitration Rules of the AAA in the agreement means that even the issue of arbitrability must to be submitted to an arbitrator.  The defendants assert that because the plaintiff's claims rest upon the Distribution Agreement as a whole, nothing in the choice of law clause of the Extension Agreement is inconsistent with the arbitration provision of the Distribution Agreement.  The defendants also contend that Northeast's claims against the other defendants should be stayed in favor of arbitration because (1) all of those claims are "inextricably intertwined" with its claims against Simply Fit Holdings Group, Inc., and (2) Northeast itself alleges that the individual defendants are Holdings' officers and agents and acted as such in connection with the alleged events from which the claims arise.

In opposition, the plaintiff contends that:

[c]entral to the fraud and defendants' efforts to conceal the fraud was the negotiation of an arbitration clause in the contract with Plaintiff.  The sole purpose of such clause was to evade public scrutiny of its efforts to defraud Plaintiff and move illicit gains from other frauds into [Holdings], until the defendants decided it was time to "squeeze out" Plaintiff without the consequence from any evidence that could be developed in a public forum, such as a

Court, and handed over to the SEC, IRS or The Justice
Department.

(Compl. ¶ 33).

In addition, the plaintiff contends that the arbitration clause is part and parcel

of a larger stock fraud scam committed by defendants Cox, Poyner, and Minahan, and

as such it is unenforceable.  The plaintiff argues that the securities fraud in which the

individual defendants diverted monies from other illicit ventures to Holdings was in

place before the contract between the parties was created and the defendants used the

contract as an instrumentality of that fraud.  The plaintiff contends that the fraud

perpetrated in connection with the Distribution Agreement invalidates the entire

contract, including the arbitration clause.  Also, the plaintiff argues that it is for the

Court to determine whether the Distribution Agreement was fraudulently induced or is

otherwise unenforceable.

Further, the plaintiff argues that the arbitration provision is not nearly as broad

as the defendants assert and that it is limited to matters arising between the parties

*under* their agreement, not to collateral or even related controversies.  As the

plaintiff's claims extend beyond the defendants' alleged breach of contract to fraud,

RICO, unfair competition, and tortious interference, the plaintiff contends that the

present controversy is beyond the scope of reasonably "arising out" of the contract

between the parties, and therefore, the arbitration provision should not apply.

In addition, the plaintiff contends that the defendants' purpose in including the arbitration clause was not limited to dispute resolution, but was designed to conceal the larger fraud activity. The plaintiff states that because the plaintiff's principals were the only parties who could link defendant Poyner to Holdings based on their personal dealings with him, forcing the conflict to arbitration would keep that link out of court and out of the public record. Further, the plaintiff states that even if the arbitration provision was valid and enforceable, defendant Poyner cannot compel arbitration because he is not a legitimate officer or employee of Holdings and has not held himself out as such.

Finally, the plaintiff contends that neither the Extension Agreement and a later amendment to the Distribution Agreement mention arbitration, so arbitration is not mandatory. Instead, the plaintiff argues, the Extension Agreement expressly provides for judicial jurisdiction.

## II.     DISCUSSION

### 1.     As to the Defendants' Motion to Dismiss or Stay the Action in Favor of Arbitration

The Federal Arbitration Act creates a strong federal policy favoring arbitration, and any doubts concerning the scope of arbitrable issues are resolved in favor of arbitration. *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991); *Opals on Ice Lingerie v. Body Lines, Inc.*, 320 F.3d 362, 369 (2d Cir. 2003). The Act provides that arbitration agreements "shall be valid,

irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract."  9 U.S.C. § 2.  Indeed, the Act "'leaves no place for the exercise of discretion by the district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.'"  *WorldCrisa Corp. v. Armstrong*, 129 F.3d 71, 75 (2d Cir. 1997) (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985)).

### A.        As to Enforceability of the Arbitration Provision

At the outset, the Court finds that the Extension Agreement's failure to expressly incorporate the terms of the arbitration provision in the Distribution Agreement does not vitiate the applicability of the arbitration provision to the present controversy.  First, the sole apparent purpose of the Extension Agreement was to extend the distribution region in which Northeast would operate.  The parties did not expressly manifest an intention to substitute or replace the Distribution Agreement. The Extension Agreement purports only to extend the plaintiff's distribution rights outside of its originally defined territory, modifying those terms of the Distribution Agreement.

Further, nothing in the Extension Agreement is inconsistent with the arbitration provision or suggests invalidity of that provision.  The Extension Agreement provides that the "parties agree to submit to the jurisdiction of the Courts of the State of Florida or the federal district court within the territorial boundaries of

the State of Florida."  At a maximum, the effect of such a provision is to select Florida courts as the forum to hear claims arising from the Extension Agreement, such as the plaintiff's claims that the defendants did not honor the "extra-territorial accounts and contacts plaintiff brought to [Holdings]."  Finally, the e-mail memorandum of understanding dated August 31, 2007, memorialized proposed certain changes to the Distribution Agreement, but did not purport to affect the arbitration provision.

In deciding whether a controversy is arbitrable, a court must consider whether the parties agreed to arbitrate; whether the claims are within the scope of their agreement**;** and whether Congress intended the plaintiff's claims to be non-arbitrable. *See Bird v. Shearson Lehman/American Express, Inc.*, 926 F.2d 116, 118 (2d Cir. 1991).  To decide if a particular dispute falls within the scope of an arbitration agreement, "a court should classify the particular clause as either broad or narrow." *Rosen v. Mega Blocks, Inc.*, No. 06CV3474, 2007 WL 1958968, at *7 (S.D.N.Y. July 6, 2007).  Where an arbitration clause is broad, "there is a presumption that the claims are arbitrable."  *Collins & Aikman Prods. Co. v. Bldg. Sys., Inc.*, 58 F.3d 16, 20 (2d Cir. 1995).

The defendants contend that the arbitration provision is broad and encompasses not only the plaintiff's breach of contract claims, but also its fraud, RICO, tortious interference claims, and unfair competition claims.  On the other hand, the plaintiff, contends that the arbitration provision is narrow and does not apply to matters regarding the defendants' alleged stock scheme because they are outside the

contractual relationship between the plaintiff and Holdings. Further, the plaintiff

contends that the arbitration provision does not reach its RICO and fraud claims

because the arbitration clause includes only controversies arising under, rather than

those arising under *and* related to, the contract.

The arbitration provision provides that: "All controversies, claims and matters

of difference arising between the parties *under* this Agreement shall be submitted to

binding arbitration in Palm Beach County, Florida under the Commercial Arbitration

Rules of the American Arbitration Association . . . ." The courts of this Circuit have

found that broad arbitration agreements extend to both claims of fraudulent

inducement to contract as well as claims not directly dependant on the contract, such

as fraud, RICO, and tort claims. *See, e.g., Nasik Breeding & Research Farm Ltd. v.

Merck & Co., Inc.*, 165 F. Supp. 2d 514, 534 (S.D.N.Y. 2001) (finding that an

arbitration provision covering "[a]ny dispute, controversy or claim arising out of or

relating to this Agreement" encompassed both the plaintiff's fraud and RICO claims).

The plaintiff contends that because the provision at issue here does not include

the term "relating to," or some reasonably expansive equivalent, the provision is

narrow and does not encompass all of the plaintiff's claims. However, the lead case

relied on by the plaintiff in support of this contention has been substantially limited by

subsequent case law. In *In re Kinoshita*, 287 F.2d 951 (2d Cir. 1961), the Second

Circuit considered an arbitration provision stating that: "If any dispute or difference

should arise under this Charter, same to be referred [to a panel of three arbitrators]."

The court found that the language of the arbitration provision was not sufficiently broad to encompass a controversy about alleged fraudulent inducement of the agreement.  *Id.* at 953.  The court compared the language of that agreement to agreements expressly encompassing disputes "related to" and "in connection with" contracts and found that the instant clause encompassed only matters of interpretation of the contract and performance, not allegations of fraud in the inducement.  *Id.*

However, subsequent cases have largely retreated from the rule in *Kinoshita*. In *ACE Capital Re Overseas Ltd. v. Central United Life Ins. Co.*, 307 F.3d 24 (2d Cir. 2002) the Second Circuit recognized that "*Kinoshita*, which was decided before the Supreme Court's more recent decisions emphasizing the strong federal policy in favor of arbitration, has frequently been criticized in this Circuit, and no decision of recent vintage mentions the case without confining it to its precise facts."  *Ace Capital*, 307 F.3d at 32–33.  Still, in *Louis Dreyfus Negoce, S.A. v. Blystad Shipping & Trading, Inc.*, 252 F.3d 218 (2d Cir. 2001), the Circuit court reaffirmed *Kinoshita* and further explained that in *Kinoshita*,

> [T]he use of the phrase 'arising under' an agreement, in an arbitration clause, indicated that the parties intended the clause be narrowly applied.  We have, however, since limited this holding to its facts, declaring that absent further limitation, only the precise language in *Kinoshita* would evince a narrow clause. . . .  To the extent a distinction exists between the present language of 'arising from' and *Kinoshita's* language of 'arising under,' we believe the distinction is more than just a semantic one, and only the latter phrase limits arbitration to a literal interpretation or performance of the contract.

*Louis Dreyfus*, 252 F.3d at 225–26.

In *S.A. Mineracao Da Trindade-Samitri v. Utah Intern., Inc.*, 745 F.2d 190 (2d Cir. 1984), with the guidance that the intent of the parties must be protected in contract construction, the Second Circuit stated:

> We decline to overrule *In re Kinoshita*, despite its inconsistency with federal policy favoring arbitration, particularly in international business disputes, because we are concerned that contracting parties may have (in theory at least) relied on that case in their formulation of an arbitration provision. We see no reason, however, why we may not confine *Kinoshita* to its precise facts. We are confident that parties who have actually relied on *Kinoshita* in an attempt to formulate a narrow arbitration provision, have adopted the exact language of the arbitration provision involved in *Kinoshita*. The provision involved in *Kinoshita* required arbitration of "any dispute or difference aris[ing] under" the agreement. Thus, to ensure that an arbitration clause is narrowly interpreted contracting parties must use the foregoing phrase or its equivalent, although the better course, obviously, would be to specify exactly which claims are and are not arbitrable.

*S.A. Mineracao*, 745 F.2d at 194.

The Court finds that the arbitration provision at issue here is broad and encompasses the plaintiff's fraudulent inducement claims for two reasons. First, as the cautionary messages of *Louis-Dreyfus* and *S.A. Mineracao* were in place long before the contract here was consummated, if the parties indeed relied on *Kinoshita* in forming their arbitration provision, they no doubt would have used the precise language in that case. However, instead of using the exact phrase "any dispute or difference . . . aris[ing] under," the parties used the slightly more expansive phrase

"*[a]ll* controversies, *claims* and matters of difference arising between the parties under this Agreement." Thus, by including "all . . . claims," the parties did not mimic the *Kinoshita* limitations. This difference, though admittedly slight, is of equal magnitude to distinctions found determinative by other courts in this Circuit. *See S.A. Mineracao*, 745 F.2d at 194 (finding distinct a clause providing "any question or dispute aris[ing] or occur[ring] under" the agreement); *St. Paul Fire & Marine Ins. Co. v. Employers Reinsurance Corp.*, 919 F. Supp. 133, 135–36 (S.D.N.Y. 1996) (finding that an arbitration provision stating "any dispute arising *out* of this Agreement" encompassed claims for fraudulent inducement (emphasis added)); *Meadows Indem. Co. v. Baccala & Shoop Ins. Servs., Inc.*, 760 F. Supp. 1036, 1043-45 (E.D.N.Y. 1991) (holding fraudulent inducement claim arbitrable where clause required arbitration of "any dispute arising *out* of this contract" (emphasis added)).

Second, the arbitration provision of the Agreement is found in the Governing Law clause of the Distribution Agreement, which also provides that the agreement shall be construed in accordance with the laws of the State of Florida. Although Florida law in the area is in general accord with New York law, at least one Florida court held an arbitration clause with similar language to require arbitration of the plaintiffs' fraud in the inducement claims. In *Beazer Homes Corp. v. Bailey*, 940 So.2d 453 (Fla. Dist. Ct. App. 2006), the court found that a provision requiring arbitration "[s]hould a controversy, claim or dispute arise out of this contract," included claims for fraudulent inducement. *Beazer*, 940 So.2d at 460; *see also*

*Medident Construction, Inc. v. Chappell*, 632 So.2d 194 (Fla. 3d DCA 1994) (referring to arbitration dispute arising from a construction contract with a provision that "all disputes between the parties" would be submitted to arbitration); *cf. Citigroup, Inc. v. Amodio*, 894 So.2d 296 (Fla. 4th DCA 2005) (giving narrow construction to an arbitration agreement providing for arbitration of "all controversies which may arise concerning any order or transaction of the construction, performance or breach of this agreement").

Accordingly, absent an express statement that the parties intended to exclude certain claims from arbitration, especially in light of the policies favoring arbitration, the Court finds that the arbitration provision here is broad and covers the plaintiff's claims pertaining to fraudulent inducement of the Agreement.

However, the plaintiff also contends that because the Distribution Agreement was fraudulently induced, and was even an instrument for advancing a larger fraud, it is invalid and the arbitration provision cannot be enforced. In a separate, but related contention, the plaintiff states that the arbitration agreement itself was sought by the defendants in order to cover-up the larger fraud and prevent it from being aired in a public forum.

The Second Circuit has stated that whether an arbitration agreement fails along with a contract embodying that agreement depends on whether the contract itself is "void" or "voidable." *Adams v. Suozzi*, 433 F.3d 220, 226–27 (2d Cir. 2005). "If a contract is "void," a party wishing to avoid arbitration does not have to challenge the

15

arbitration clause specifically; if a contract is "voidable," the party must show that the arbitration clause itself is unenforceable." *Id.* at 227. "A contract is "void" when, for example, there was no meeting of the minds about essential terms or where there was fraud in the factum." *Id.* In contrast, "[a]n agreement entered into through fraud in the inducement is an example of a "voidable" contract." *Id.* "Fraud in the factum occurs in those 'rare cases' where 'the misrepresentation is regarded as going to the very character of the proposed contract itself, as when one party induces the other to sign a document by falsely stating that it has no legal effect.'" *Revak v. SEC Realty Corp.* 18 F.3d 81, 91 (2d Cir. 1994) (quoting E.A. Farnsworth, Contracts § 4.10 (1990)).

Here, the plaintiff does not dispute that its principals reviewed and understood the agreement before signing on its behalf. Therefore, the plaintiff has not raised a question of fraud in the factum. Instead, the plaintiff's allegations with respect to fraud perpetrated by the defendant to secure the contract are of the "fraud in the inducement" type. Thus, the plaintiff cannot avoid the effect of the arbitration provision unless it alleges that the arbitration clause itself is voidable. *See Denney v. BDO Seidman, L.L.P.*, 412 F.3d 58, 67 (2d Cir. 2005) ("A party alleging that a contract is void may be entitled to a trial prior to arbitration whereas a party merely alleging that a contract is voidable, who does not further allege that the arbitration clause itself is voidable, will be compelled to arbitrate the dispute." (internal quotations and citations omitted)).

Although most of the plaintiff's arguments are directed to the alleged fraud surrounding the contract itself, the plaintiff also implicitly alleges that the arbitration provision is voidable. The plaintiff argues that the defendants' intent in including the arbitration provision was not for dispute resolution, but rather was to prevent the development of a court record and public disclosure of their fraudulent activities. Further, the plaintiff contends that Holdings desired such a cover-up mechanism to conceal the involvement of defendant Poyner in its scheme. As a result, the plaintiff contends, the arbitration provision was "part and parcel" of the larger fraud.

However, bare allegations regarding the voidability of the arbitration provision are not sufficient and the plaintiff must produce some evidence substantiating its contentions. *See Sphere Drake Ins. Ltd. v. Clarendon Nat. Ins. Co.*, 263 F.3d 26, 32 (2d Cir. 2001) (citing *Interbras Cayman Co. v. Orient Victory Shipping Co., S.A.*, 663 F.2d 4, 7 (2d Cir.1981) (per curiam)). Where fraud regarding the arbitration clause itself is alleged, "there must be some substantial relationship between the fraud or misrepresentation and the arbitration clause in particular. This substantial relationship requires more than a mere claim that the arbitration clause is an element of the scheme to defraud; it must include particularized facts specific to the . . . arbitration clause which indicate how it was used to effect the scheme to defraud." *Rubin v. Sona Intern. Corp.*, 457 F. Supp. 2d 191, 195 (S.D.N.Y. 2006).

The plaintiff's statement of its "belief" regarding the defendants' intentions, without more, is insufficient to show voidability of the arbitration clause. Aside from

17

characterizing the arbitration provision as "part and parcel" of the larger stock scheme the plaintiff presents no evidence to support a finding that the arbitration clause was itself induced by fraud. The plaintiff offers no document or witness statement in support of its theory of the defendants' intent; it offers no evidence regarding any representations made by the defendants about the arbitration provision at the time the Distributorship Agreement was executed; and it offers no evidence regarding the parties' negotiation of the arbitration provision. Thus, as the question of fraudulent inducement of the Agreement is within the scope of the broad arbitration provision, the question of the validity of the contract itself must go to an arbitrator.

### B. As to Scope of the Arbitration Provision

As discussed above, the arbitration provision here is entitled to broad interpretation. When faced with such provisions, the Second Circuit has instructed:

> In determining whether a particular claim falls within the scope of the parties' arbitration agreement, we focus on the allegations in the complaint rather than the legal causes of action asserted. If the allegations underlying the claims touch matters covered by the parties' . . . agreements, then those claims must be arbitrated, whatever the legal labels attached to them.

*Collins & Aikman Products Co. v. Building Systems, Inc*., 58 F.3d 16 (2d Cir. 1995) (internal quotations and citations omitted).

All of the plaintiff's claims find their genesis in the parties' contractual relationship; there are no claims, for example, that the plaintiff incurred losses resulting from stock purchases or other investment in the defendants' alleged stock scheme. Instead, the central allegations are: (1) the defendants' representations, made

to induce the plaintiff into a distributorship agreement, (2) the defendants' failure to follow through on those representations, (3) the defendants' breach of the distributorship agreement, unfair competition with the plaintiff, and interference with the plaintiff's other business relationships, and (4) the defendants' use of the Distributorship Agreement for improper purposes, and the plaintiff's losses as a result of these activities. All of the plaintiff's extra-contractual claims are appropriate for arbitration because they relate to the parties' contractual relationship. *See Symphony Fabrics Corp. v. Knapel*, No. 07CV6606, 2008 WL 2332333, at *6 (S.D.N.Y. June 2, 2008) (finding claims for conversion, unjust enrichment, breach of fiduciary duty, fraud, and misrepresentation arose from the parties' contractual relationship); *Orange County Choppers, Inc. v. Goen Technologies Corp.*, 374 F. Supp. 2d 372, 374 (S.D.N.Y. 200) (compelling arbitration of plaintiff's unfair competition and trademark infringement claims where resolution of the dispute required interpretation of the parties' agreement); *Nasik*, 165 F. Supp. 2d at 534.

**C.     As to Whether Poyner May Enforce the Arbitration Provision**

The plaintiff contends that there is no authority to compel arbitration with defendant Poyner because he holds no office with Holdings, is not an officer or employee of that entity as has never held himself out as such. Further, the plaintiff contends that Poyner's fraudulent scheme extends beyond the Distribution Agreement.

It is indisputable that non-signatory agents of an entity may move to compel arbitration. *See Roby v. Corp. of Lloyd's*, 996 F.2d 1353, 1360 (2d Cir.1993). The

Second Circuit has stated that "employees or disclosed agents of an entity that is a party to an arbitration agreement are protected by that agreement." *Id.* Despite the plaintiff's present contentions regarding Poyner's status, by its complaint it concedes that Poyner is among Holdings' "principals and agents" and further identifies Poyner as the "control person in Holdings and either a shareholder or a disguised shareholder of Holdings." (Compl. ¶¶ 3, 4). Further, the complaint is replete with allegations of Poyner's involvement on behalf of Holdings with respect to the plaintiff and the Distribution Agreement. (Compl. ¶¶ 24, 26(g) and(n)). Thus, the Court finds that Poyner is among the parties who may appropriately move to compel arbitration. *Roby*, 996 F.2d at 1360 (finding that agents who, while acting for a principal, allegedly violated securities law are subject to the arbitration agreement between plaintiffs and the principal); *see also Beazer*, 940 So. 2d at 462.

**D.      As to Whether the Action Should be Stayed or Dismissed**

In accordance with Section 3 of the Federal Arbitration Act, the Court will stay this action pending the resolution of the arbitration and will retain jurisdiction over any subsequent petition for judicial review of any award. *See In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 400 (S.D.N.Y. 2003) ("Section 3 of the FAA provides that the court must stay any suit or proceeding until arbitration has been completed if the action concerns 'any issue referable to arbitration' under a written agreement for such arbitration.").

**2.      Plaintiff's Motion to Disqualify Altman & Company**

On July 25, 1998, this Court permitted Altman & Company P.C. (the "Altman firm") to withdraw from representation of Simply Fit Holdings Group, Inc. and Robert L. Cox, following a motion by the Altman firm, on the basis that defendant Cox had terminated their representation. The plaintiff now seeks to disqualify the Altman firm from representing Defendants Poyner and Minahan because of an alleged conflict of interest and the possibility that members of the Altman firm were witness to facts underlying this action.

The plaintiff states that the Altman firm was intimately involved in the functioning of Holdings and has been named as a party in a shareholder derivative action going forward in a District Court in Florida for allegedly breaching its fiduciary duty to Holdings.  In addition, the plaintiff asserts that while allegedly working on behalf of Holdings, the Altman firm was also advising its purported licensor, Silverman & Minahan Beverage Company LLC, ("SMBC"), and its principals, Poyner and Minahan.  The plaintiff asserts that throughout the Altman firm's representation of the defendants, its "mutli-hatted" activities were inappropriate and the interests of SMBC, Poyner and Minahan were routinely favored to the detriment of Holdings and Cox.  The plaintiff further charges that the Altman firm aided, abetted, and facilitated the looting of Holdings by engaging in sham transactions.

Northeast contends that the Altman firm, and especially Steven Altman, Esq., have violated several Canons of Ethics of the New York Code of Professional

Responsibility by representing various parties with adverse interests. The plaintiff contends that Altman has failed to exercise independent professional judgment on behalf of his client, Cox. Further, the plaintiff charges that Altman knowingly let a client commit perjury during an unrelated SEC investigation. In addition, the plaintiff asserts that Cox and Holdings "must" have a reasonable apprehension that Altman and his firm will make use of negative information obtained as a result of his joint representation of the defendants.

Further, the plaintiff contends that it is inevitable that Altman will be a witness in the present action, especially regarding the relationship between Holdings and SMBC and the allegation that these entities were used as vehicles in an alleged fraud.

The Altman firm and Poyner and Minahan resist this motion on the basis that the continued representation of Poyner and Minahan does not conflict with their prior representation of all defendants. Altman explains that although there was no conflict in the positions of the defendants when he first appeared in this action, he explained the potential for future conflicts to them at that time. In addition, Cox executed a retainer agreement on behalf of himself and Holdings, acknowledging that the Altman firm could continue to represent Poyner if a conflict developed. The Altman firm has offered to submit a copy of the retainer for an *in camera* review, if necessary.

The Altman firm asserts that although the interests of the defendants were aligned when it undertook representation, in late June, 2008, Cox and other Holdings officers resigned from the company and fired the Altman firm as counsel. Altman

concedes that shortly thereafter, SMBC revoked Holdings' license to make and sell the Simply Fit product and commenced an action against Cox and other former Holdings personnel for trademark infringement and unfair competition.

The Altman firm contends that disqualification in this action is inappropriate because Cox and Holdings did not have a reasonable expectation to believe that their confidences would be kept from co-defendants. Further, the Altman firm contends that the movant bears the burden of establishing that counsel is a necessary witness and has failed to meet its burden because it has not identified as to which facts relevant to the present dispute would Altman be a witness.

Courts within this Circuit have found that "disqualification of an attorney for an alleged conflict of interest, is a substantive matter for the courts and not the arbitrator." *Munich Reinsurance America, Inc. v. ACE Prop. & Cas. Ins. Co*., 500 F. Supp. 2d 272, 275 (S.D.N.Y. 2007); *In Matter of Arbitration Between R3 Aerospace Inc., Marshall of Cambridge Aerospace Ltd.*, 927 F. Supp. 121, 123 (S.D.N.Y.1996) ("[P]ossible attorney disqualification-is not capable of settlement by arbitration."). Accordingly, the Court must decide this issue prior to submitting this matter for arbitration.

A motion to disqualify an attorney falls within the discretion of the Court. *Purgess v. Sharrock*, 33 F.3d 134, 144 (2d Cir. 1994) ("The disqualification of an attorney in order to forestall violation of ethical principles is a matter committed to the sound discretion of the district court."). The remedy of disqualification is granted

only in limited circumstances and the moving party "bears a heavy burden of proving facts required for disqualification." *Export Dev. Corp. v. Uniforms for Industry, Inc.*, No. 88CV2496, 1991 WL 10929, at *2 (E.D.N.Y. Jan 25, 1991) (quoting *In re Joint Eastern and Southern District Asbestos Litigation*, 133 F.R.D. 425,429 (E.D.N.Y. 1990)); *see also Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981) ("[r]ecognizing the serious impact of attorney disqualification on the client's right to select counsel of his choice, we have indicated that such relief should ordinarily be granted only when a violation of the Canons of the Code of Professional Responsibility poses a significant risk of trial taint"). "This reluctance stems from concerns over the 'immediate adverse effect' disqualification has on the client separated from his lawyer . . . , the desire 'to preserve, to the greatest extent possible, . . . the individual's right to be represented by counsel of his or her choice,' . . . and the awareness that disqualification motions are being made, with increasing frequency, with purely strategic purposes in mind." *Vegetable Kingdom, Inc. v. Katzen*, 653 F. Supp. 917, 921 (N.D.N.Y. 1987).

Importantly, the present motion was made by the plaintiff, and neither Cox nor Holdings have moved to disqualify their former counsel from representing the remaining defendants in this action. Although attorneys are charged with the responsibility of reporting conflicts and other unprofessional conduct and parties not affected by a conflict are free to move for disqualification, courts must act cautiously where disqualification motions are made by unaffected parties as such motions are

often no more than tactical devices. *Adams v. Village of Keesville*, 07CV452, 2008 WL 3413867, at *10 (N.D.N.Y. Aug. 8, 2008) ("Given the court's oversight obligation, a motion to disqualify an attorney, even if brought by an unaffected party, is an appropriate means by which to bring the conflict issue to the court's attention."); *see also Allegaert v. Perot*, 565 F.2d 246, 251 (2d Cir. 1977) (recognizing that "disqualification motions have become common tools of the litigation process, being used for purely strategic purposes . . . ." (internal quotations and citations omitted)); *Clark v. Bank of New York*, 801 F. Supp. 1182, 1196 (S.D.N.Y. 1992) ("Motions to disqualify opposing counsel are viewed with disfavor in this Circuit because they are often interposed for tactical reasons and result in unnecessary delay." (internal quotations and citations omitted)).

> **A.      Whether the Altman Firm Should be Disqualified for a Conflict of Interest**

Although the Court looks to the New York Code and the American Bar Association's Model Code of Professional responsibility for guidance, disqualification in the federal courts is a matter of federal law. *Almonte v. City of Long Beach*, No. 04CV4192, 2007 WL 951863, at *3 (E.D.N.Y. March 27, 2007).   New York's Code of Professional Responsibility D.R. 5-108 reads, in part, as follows:  "[A] lawyer who has represented a client in a matter shall not, without the consent of the former client after full disclosure . . . [t]hereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to

the interests of the former client." Further, "an attorney may not knowingly reveal a client confidence if to do so would disadvantage that client." *Clark*, 801 F. Supp. at 1197.

The Second Circuit has recently explained that:

> One recognized form of taint arises when an attorney places himself in a position where he could use a client's privileged information against that client. The standard for disqualification varies depending on whether the representation is concurrent or successive. In cases of concurrent representation, we have ruled it is 'prima facie improper' for an attorney to simultaneously represent a client and another party with interests directly adverse to that client. *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir. 1976). The attorney "must be prepared to show, at the very least, that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his representation." *Id.* In cases of successive representation, we have held that an attorney may be disqualified if:
> (1) the moving party is a former client of the adverse party's counsel;
> (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and
> (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client. *Evans v. Artek Sys. Corp.*, 715 F.2d 788, 791 (2d Cir. 1983).

*Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 133 (2d Cir. 2005).

The Court must be mindful of the potential misuse of confidential information to a client's detriment during subsequent representation of another. *Almonte*, 2007 WL 951863, at *3.

Although the plaintiff expresses concern for the confidences of Cox and Holdings, courts have found that "before the substantial relationship test is even implicated, it must be shown that the attorney was in a position where he could have received information which his former client might reasonably have assumed the attorney would withhold from his present client." *Rocchigiani v. World Boxing Counsel*, 82 F. Supp. 2d 182, 187 (S.D.N.Y. 2000). Where the prior representation by the attorney was joint representation between a former, but now adverse, client and a present, long-standing client, "the substantial relationship test is inapposite," as the former client could not reasonably expect confidences imparted during joint representation to be withheld from co-parties. *Id.* at 187–88 (citing *Allegaert v. Perot*, 565 F.2d 246, 251 (2d Cir. 1977)); *see also Bass Public Limited Co. v. Promus Companies, Inc.*, No. 92CV0969, 1994 WL 9680, at *5 (S.D.N.Y. Jan. 10, 1994) ("Canon 4 does not apply where the attorney's alleged disqualification arises out of the simultaneous representation of two clients, and the [former] client was aware of the attorney's relationship with the other client."). Here, as in *Rocchigiani*, any representation of Cox and Holdings was done with their knowledge that the Altman firm continued to represent the interests of Poyner and Minahan. *See Rocchigiani*, 82 F. Supp. 2d at 188.

The defendants to this action have yet to take inconsistent, no less adverse, positions with respect to their liability to Northeast. Further, there is no indication here that the Altman firm has attained information through the course of its

representation of Cox and Holdings that would be used to the detriment of Poyner and Minahan.  Finally, according to the Altman firm, Cox signed a knowing waiver of potential conflicts when the firm undertook joint representation of Cox and his co-defendants.  There is no allegation here that the Altman firm has violated New York's Code of Professional Responsibility D.R. 5-105 by failing to obtain Cox's informed consent to joint representation.  Accordingly, the Court finds no reason to disqualify the Altman firm on the basis of a conflict of interest at this time.

**B.    Whether Steven Altman will be a Necessary Witness in this Action**

New York's Code of Professional Responsibility D.R. 5-102(d) provides that:

A.    A lawyer shall not act, or accept employment that contemplates the lawyer's acting, as an advocate on issues of fact before any tribunal if the lawyer knows or it is obvious that the lawyer ought to be called as a witness on a significant issue on behalf of the client, except that the lawyer may act as an advocate and also testify:

1. If the testimony will relate solely to an uncontested issue.

2. If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.

3. If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or the lawyer's firm to the client.

4. As to any matter, if disqualification as an advocate would work a substantial hardship on the client because of the distinctive value of the lawyer as counsel in the particular case.

. . . .

D.      If, after undertaking employment in contemplated or
pending litigation, a lawyer learns . . . that the lawyer or a lawyer
in his or her firm may be called as a witness on a significant issue
other than on behalf of the client, the lawyer may continue the
representation until it is apparent that the testimony may be
prejudicial to the client at which point the lawyer and the firm
must withdraw from acting as an advocate before the tribunal.

Here, the plaintiff has failed to specify the matters that Steven Altman will

necessarily have to testify about.  Also, significantly, it is not at all clear that any

testimony by Altman would be adverse to the interests of his clients or his former

clients.  D.R. 5-102(D) requires mandatory disqualification only where it is shown that

the lawyer's testimony will be adverse to the client.  *Adams*, 2008 WL 3413867, at

*12 ("Without knowing whether a client is substantially prejudiced, an

advocate-witness-driven motion to disqualify is premature.").

For the foregoing reasons, the plaintiff's motion to disqualify Altman &

Company is premature and is, therefore, denied without prejudice.

**3.      As to the Defendants' Motion for Sanctions Against Northeast and Its
        Counsel**

The defendants move for sanctions against Northeast and its counsel pursuant

to Fed. R. Civ. P. 11.  The defendants contend that the complaint filed in this action is

frivolous because all of the plaintiff's claims are subject to the mandatory arbitration

provision of the Distributorship Agreement and are otherwise insufficient to state

legally cognizable claims.  The Court finds that such sanctions are unwarranted in this

case.  The motion is, therefore, denied.

### III.     CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED**, that the defendants' motion to compel arbitration on all of the plaintiff's claims is granted; and it is further

**ORDERED**, that this action by Northeast against the defendants is stayed pending conclusion of the arbitration proceeding; and it is further

**ORDERED**, that Northeast's motion to disqualify Altman & Company P.C. is denied, and it is further

**ORDERED**, that the defendants' motion for sanctions against Northeast and its counsel is denied.

**SO ORDERED.**
Dated: Central Islip, New York
          September 26, 2008

_____/s/ Arthur D. Spatt_____
ARTHUR D. SPATT
United States District Judge